**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

WIENER, WEISS & MADISON, A        CIVIL ACTION NO. 16-0850
PROFESSIONAL CORPORATION, ET AL.

VERSUS                  JUDGE S. MAURICE HICKS, JR.

LESLIE B. FOX             MAGISTRATE JUDGE HAYES

### MEMORANDUM RULING

The Plaintiffs, Wiener, Weiss & Madison, A Professional Law Corporation, and Kantrow, Spaht, Weaver & Blitzer (A Professional Law Corporation) (collectively, the "Firms") filed the present Partial Motions for Summary Judgment against Defendant, Leslie B. Fox ("Fox") claiming the inapplicability of Louisiana Rules of Professional Conduct 1.5(d)(1) and 1.8(a) as it concerns the contingency fee agreements entered into between the Firms and Fox. See Record Documents 43 and 49. In response, Fox filed a Cross-Motion for Partial Summary Judgment. See Record Document 42. Furthermore, the Firms filed Motions to Strike the Declaration of Charles Wolfram ("Wolfram") and Dane Ciolino ("Ciolino") and the Supplemental Declaration of Wolfram. See Record Documents 53 and 66. After careful consideration of all parties' submissions, and the law applicable before the Court, the Firms' Motions for Partial Summary Judgment (Record Documents 43 and 49) are **GRANTED**. Fox's Cross-Motion for Partial Summary Judgment (Record Document 42) is **DENIED**. Moreover, the Firms' Motions to Strike (Record Documents 53 and 66) are **GRANTED**.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

This is an action for breach of a contingency fee contract between the Firms and their former client, Fox. Although the factual and procedural background of this case is extensive, it is necessary for the Court to set forth the complete factual background in order to gain a complete understanding of the underlying dispute.

On July 6, 2005, Fox filed for divorce from her husband, Harold Rosbottom, Jr. ("Rosbottom"), in the 256th Judicial District Court of Dallas County, Texas ("Texas Divorce Proceeding"). See Record Document 42-2 at 14, ¶ 2. Throughout the Texas Divorce Proceeding, Rosbottom repeatedly disregarded court orders, including orders regarding the disclosure of certain financial information and other data pertaining to his business interests. See id. at ¶ 4; see Record Document 42-3 at 8. As a result, on June 9, 2009, the Texas district court orally appointed a receiver to assume control over the community estate. See id. at ¶ 2; see id. at 1. However, within hours of the court's ruling, Rosbottom filed for Chapter 11 bankruptcy in the Western District of Louisiana. See Record Document 42-3 at 1, ¶ 1.

The bankruptcy consisted of two related proceedings, namely:

 (a)    a Chapter 11 bankruptcy filed by Rosbottom, see In re Harold L. Rosbottom, Jr., No. 09-BR-11674 (W.D. La. filed June 9, 2009) ("BR Docket No. 09-11674"); and

 (b)    a Chapter 11 bankruptcy proceeding filed by Caddo- Bossier Gaming Company, LLC (an entity owned by Fox and Rosbottom), see In re Caddo-Bossier Gaming Company, LLC, No. 09-BR-11673 (W.D. La. filed June 9, 2009).

---

[1] The Court notes that there are factual disputes between the Firms and Fox. However, the factual disputes, at this stage in the proceedings, are not material, i.e., the factual disputes do not affect the Court's determination of the applicability of Louisiana Rules of Professional Conduct 1.5(d)(1) and 1.8(a). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

(collectively, the "bankruptcy proceedings"). <u>See</u> Record Document 1 at 2, ¶ 7. The bankruptcy proceedings had the effect of transferring all matters relating to the couple's community property, including community property division, from the Texas family court into the Louisiana bankruptcy court. <u>See id.</u> at 3-5, ¶¶ 10, 14, 18; <u>see</u> Record Document 42-2 at 14-15, ¶¶ 3, 6-7. Additionally, Fox had claims against Rosbottom's bankruptcy estate for delinquent monthly support payments of prior support orders of the Texas family court. <u>See</u> Record Document 1 at 1, 4, ¶¶ 13, 65.

On June 16, 2009, Wiener Weiss & Madison ("WWM") agreed to represent Fox in the bankruptcy proceedings and any and all matters relating to those bankruptcy cases for the purpose of protecting Fox's interest in the community estate. <u>See</u> Record Document 1 at 2, ¶¶ 7, 15; <u>see</u> Record Document 42-3 at 26. WWM recommended that Fox also retain Kantrow, Spaht, Weaver & Blitzer ("KSWB"), to which Fox consented. <u>See</u> Record Document 42-3 at 29-34; <u>see</u> Record Document 42-4 at 1. As set forth in the engagement letters, the Firms agreed to represent Fox on an hourly fee basis. <u>See</u> Record Document 42-3 at 26-34, <u>see</u> Record Document 42-4 at 1. However, recognizing that Fox's assets were tied up in the bankruptcy proceedings, the Firms agreed to seek their fees directly from the bankruptcy court, to be payable out of the Rosbottom bankruptcy estate. <u>See</u> Record Document 42-3 at 26.

"The Firms jointly pursued Fox's community property, support, and other interests in the bankruptcy proceedings and began incurring substantial fees and expenses." Record Document 49-3 at 2, ¶ 12, Declaration Pursuant to 28 U.S.C. § 1746 of R. Joseph Naus ("Naus"). For example, "the Firms commenced an investigation for the purposes of locating assets and liabilities that were not included on Rosbottom's bankruptcy

schedules." Id. at ¶ 13. As a result of the Firms efforts, with the help of Fox and others, the Firms identified and located "community assets of significant value that Rosbottom had illegally and fraudulently concealed, both pre- and post-bankruptcy, thereby substantially enhancing the value of the Rosbottom bankruptcy estate for the benefit of Fox and the other creditors." Id. at ¶ 14. Additionally, "the Firms' investigation revealed that Rosbottom had wasted and mismanaged the assets of the community both prior to and during the pendency of the bankruptcy proceedings." Id. at ¶ 15.

Based on the extensive evidence the Firms developed, the Firms "filed a motion to remove Rosbottom as the debtor in possession and appoint a Chapter 11 bankruptcy trustee in his place." Id. at ¶ 16. On February 19, 2010, the bankruptcy court appointed a Chapter 11 Trustee ("Trustee") to assume control of Rosbottom's business affairs and assets and to otherwise reorganize the significant debts owed by Rosbottom individually and the many corporations, partnerships and limited liability companies under his direction or control. See Record Document 42-5 at 1, 20; see Record Document 42-7 at 12.

With the appointment of the Trustee, the Firms achieved Fox's initial objectives of ending Rosbottom's fraudulent control over the bankruptcy estate and enforcing her support obligations. See Record Document 49-3 at 3, ¶ 18. However, the Firms had not been paid for their services, and virtually all of Fox's assets remained tied up in the bankruptcy. In the first eight months of representation, the Firms billed 3,361.75 hours of time and $1,216,656.92 in fees and expenses to Fox. See Record Document 42-8 at 18, 49-51. Accordingly, "in line with their engagement letters, the Firms moved the bankruptcy court for an order, pursuant to 11 U.S.C. § 331, requiring that the bankruptcy estate pay

the Firms' professional fees as administrative expenses." Record Document 49-3 at 3, ¶ 20. "However, the bankruptcy court denied that motion, holding the Bankruptcy Code did not authorize the court to pay the professional fees of a non-debtor spouse or creditor like Fox." Id. Following this ruling, "the Firms submitted a Substantial Contribution Application to the bankruptcy court pursuant to 11 U.S.C. § 503(b)(3)(D)." Id. at ¶ 21. "In their Substantial Contribution Application, the Firms contended that the Rosbottom bankruptcy estate should pay the Firms $1.2 million for their fees and expenses incurred through February 28, 2010, because their work— culminating in the appointment of the Trustee— had substantially enhanced the value of, and preserved, the bankruptcy estate for the benefit of the creditors as a whole." Id. The bankruptcy court ultimately approved the Firms' Substantial Contribution Application, and the Firms received payment for all of their fees for its work performed through February 28, 2010. See Record Document 33 at 4, ¶ 12.

Following the appointment of the Trustee, Fox sought the Firms assistance in:

(a)     working with the Trustee to preserve and protect her equity interest in the bankruptcy estate and to identify additional assets that Rosbottom had concealed;

(b)     enforcing her rights against the bankruptcy estate for monthly support payments;

(c)     defending against various creditors' claims made against her, individually;

(d)     investigating her and her children's interest in various entities ostensibly owned by the children in which Rosbottom had attempted to divert millions of dollars of community assets; and

(e)     assisting her with the Trustee's demand that she vacate her home in Dallas and liquidate its contents.

Record Document 49-3 at 3-4, ¶ 23. "In addition, Fox needed assistance in connection with a criminal investigation that had been initiated against Rosbottom by the United States Attorney for the Western District of Louisiana." <u>Id.</u> at 4, ¶ 24. However, since virtually all of Fox's assets were the property of Rosbottom's bankruptcy estate and she was receiving no support payments from her former husband, Fox did not have the means to pay the Firms' fees and expenses for the Firms continued representation. <u>See id.</u> at ¶ 26. Therefore, in November 2009, Fox requested that the Firms submit a proposal to her for her consideration concerning the fees. <u>See id.</u> On April 29, 2010, the Firms tendered to Fox a new fee agreement ("2010 agreement"). <u>See</u> Record Document 42-4 at 4-5. The 2010 agreement, which was to be retroactively effective as of March 1, 2010, altered the fee arrangement between Fox and the Firms from an hourly arrangement to a contingency fee arrangement "on a going forward basis." <u>Id.</u> at 4. The 2010 agreement stated that "[a]t the outset of the case, it was hoped that the bankruptcy case would be relatively short. However, we currently cannot estimate when the case might end and what the results might be." <u>Id.</u> The 2010 agreement proposed that Fox grant to the Firms:

> an undivided vested interest in the gross proceeds (whether cash or property) (the "Gross Proceeds") distributed to [Fox] either for [her] claims against the bankruptcy estate or as an equity owner of the bankruptcy estate of Harold L. Rosbottom, Jr., the following: 25% if the value of the Gross Proceeds is $3,000,000 or less, 30% if the value of the Gross Proceeds is between $3,000,000 and $5,000,000, and 35% if the value of the Gross Proceeds is more than $5,000,000 . . . .

<u>Id.</u> On May 3, 2010, Fox and the Firms entered into a written contingency fee agreement. <u>See</u> Record Document 49-3 at 4, ¶ 27.

"With the bankruptcy estate now under the Trustee's sole management and control, the Firms filed an adversary proceeding on behalf of Fox against Rosbottom,

seeking an inequitable distribution of the equity of the bankruptcy estate because of Rosbottom's fraud, waste, and mismanagement of the community." Id. at ¶¶ 28-29. "Following the entry of a preliminary injunction in the adversary proceeding, Rosbottom agreed to a settlement, whereby any remaining equity in the bankruptcy estate would be allocated between him and Fox, 25 percent and 75 percent, respectively." Id. at ¶ 29. However, the Firms, with the assistance of others, thereafter discovered that Rosbottom was continuing to conceal community assets and the Firms moved the bankruptcy court to set aside the settlement. See id. at ¶ 30.

On March 22, 2013, while the motion to set aside the settlement was pending, the Trustee proposed a plan of reorganization (the "Plan"). See Record Document 42-5 at 1. The Plan included language that entitled Fox to 100 percent of the equity of the bankruptcy estate due to Rosbottom's conduct, which included 100 percent equity interest in Louisiana Truck Stop and Gaming, LLC (referred to in the Plan as ABC Holding, LLC and hereinafter referred to as "LTSG") . See Record Document 1 at 14, ¶ 61, see Record Document 42-5 at 28-30.

"On May 1, 2013, the bankruptcy court confirmed the Plan, with the result that, after payment of the claims of all of the creditors, 100 percent of the bankruptcy estate's equity would become vested in Fox, subject to the terms and conditions of the Plan and the Trustee's continued control and administration." Record Document 49-3 at 5, ¶ 32. One of the conditions of the Plan required Fox to finalize her divorce from Rosbottom in order to become vested. The Plan stated that:

> After entry of a final unappealable divorce decree and community partition ("Divorce Condition"), the Trustee will agree to transfer the membership interests of [LTSG] to [Fox], subject to the terms of this Plan . . . . Prior to

the Divorce Condition, [Fox] shall have no right or claim, vested or otherwise, to the membership interests in [LTSG] . . . .

Record Document 42-5 at 28. Accordingly, on May 17, 2013, Fox represented by her Texas divorce attorney, Michael DeBruin ("DeBruin") appeared for a hearing in the divorce action whereby the judge entered a final divorce decree. See Record Document 43-4 at 4, ¶¶ 20-21. Nonetheless, the bankruptcy estate still had substantial debt remaining and liquidation of the estate by the Trustee remained a possibility. See Record Document 49-3 at 5, ¶ 36. Therefore, it was still uncertain if Fox would receive any distributions from the estate. See id.

"Although the original scope of the Firms' work had largely been concluded, Fox desired the Firms to continue to represent her during the post-confirmation period in an effort to preserve and maximize the value of her expected equity interest in the bankruptcy estate, to avoid the Trustee's sale of the estate's assets, and generally to assist her in matters related to the Plan." Id. at ¶ 38. Specifically, Fox wanted the Firms to help her:

(a)    raise money by selling a portion of her equity in the bankruptcy estate to an investor who could help her manage the gaming assets,

(b)    secure a loan to buy out the creditors before the deadline imposed by the Plan, and/or

(c)    otherwise help her end the Trustee's expensive administration, allowing her to come into full and unfettered possession of the estate's assets.

Id. at 5-6, ¶ 39. "After consultation with Fox, the Firms agreed to continue to represent her with respect to these post-confirmation and other matters." Id. at 6, ¶ 40. On May 29, 2013, Fox and the Firms modified their prior contingency fee agreement. The amended contingency fee agreement provided in pertinent part:

Pursuant to the telephone conversation that David and I [David Rubin and Chip Naus] had with you on Friday, May 24, 2013, this will serve to confirm the modification of the prior contingent fee arrangement between you (signed by you on May 3, 2010) and [the Firms]. For the reasons we discussed in our telephone conversation and pursuant to your agreement, the Firms collectively will be paid a contingency fee of 40%, 20% to each, based on the work that the Firms have performed on your behalf from and after March 1, 2010, and will continue to perform on your behalf in connection with your interest and rights under the confirmed plan or reorganization in the Harold L. Rosbottom, Jr. bankruptcy case, including without limitation as the 100% equity owner of ABC Holding, L.L.C. Accordingly, pursuant to the modified contingent fee agreement, which replaces the prior agreement you signed with the Firms on May 3, 2010:

You hereby assign, set over, and grant jointly to the Firms an undivided vested interest in the gross proceeds (whether cash or property) (the "Gross Proceeds") distributed to you on or on account of your rights under the confirmed plan of reorganization in the Harold L. Rosbottom bankruptcy case, including without limitation as the 100% equity owner of ABC Holding, L.L.C. (the "Agreed Fees"). In addition to the payment of the Agreed Fees, you also agree to pay all costs incurred by the Firms in their representation of you, such as copying costs, travel costs, experts, accountants, consultants, or the like.

In consideration for your agreement to increase the contingency fee from 35% to 40%, the Firms will not seek to recover, as part of its contingency fee, any portion of the salary paid to you on account of your 100% equity interest in ABC Holding, L.L.C. from June 1, 2013, through May 31, 2014, and the Firms also will continue to work on your behalf to maximize the value of your interest in ABC Holding, L.L.C. and any other interest you have under the confirmed plan of reorganization in the bankruptcy case of Harold L. Rosbottom, Jr.

David and I sincerely appreciate your continued trust and confidence in us, and we appreciate your willingness to enter into this modified contingent fee agreement in order to compensate the Firms for the work we have done and will continue to do on your behalf. . . .

Record Document 42-6 at 7-8.

Over the course of the next two years, the condition of the bankruptcy estate improved to the point that Fox and the bankruptcy estate, with the assistance of the Firms, were able to obtain two loans sufficient to pay off the remaining creditors. See Record

Document 1 at 19, ¶¶ 81, 84; <u>see</u> Record Document 49-3 at 6, ¶¶ 43-48. This allowed Fox, upon approval of the Louisiana State Police Department as to Fox's ownership of the gaming assets, to assume total management, possession, ownership, and control of 100 percent of the bankruptcy estate's assets, free and clear of the Plan's restrictions and the bankruptcy creditors' claims. <u>See id.</u>; <u>see id.</u> at 7, ¶ 51.

"In late 2015, with the Firms work substantially completed and with Fox now receiving compensation from the bankruptcy estate, the Firms commenced discussions with Fox concerning the implementation of their contingency fee agreement." Record Document 49-3 at 7, ¶ 52; <u>see</u> Record Document 42-6 at 9-10. "In January 2016, the Firms sent Fox a proposed implementation agreement and advised her in writing to seek the advice of independent counsel regarding the proposed agreement." <u>Id.</u> at ¶ 53; <u>see id.</u> at 11. "Shortly thereafter, Fox ceased communications with Firms." <u>Id.</u> at ¶ 54. Fox informed the Firms, through separate counsel, that she declined to accept the proposed implementation agreement and that she believed the Firms' contingency fee agreement was unenforceable." <u>Id.</u> at ¶ 55. "Thereafter, the Firms withdrew as Fox's counsel in the Bankruptcy Proceedings." <u>Id.</u> at ¶ 56.

On June 16, 2016, the Firms filed suit against Fox for breach of the contingency fee agreements. <u>See</u> Record Document 1. Fox answered the Firms' complaint and asserted, among other claims, that the Firms breached their fiduciary duty to Fox and that the 2010 and 2013 Agreement violated the applicable rules of professional conduct and responsibility. <u>See</u> Record Document 30. Fox argues that the contingency fee agreements involved a "domestic relations matter" and thus violate Rule 1.5(d)(1). Furthermore, Fox argues that the Firms contingency fee agreements resulted in Fox

entering into a "business transaction" with the Firms and the Firms failed to follow the procedures enumerated in Louisiana Rule of Professional Conduct 1.8(a). Thus, the Firms violated Rule 1.8(a), which renders the contingency fee agreements unenforceable. As a result of the alleged violations, Fox contends that the contingency fee agreements are unenforceable and seeks damages, disgorgement, and attorney's fees for breach of fiduciary duty. See id.

## LAW AND ANALYSIS

### I. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. This rule provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Also, "a party asserting that a fact cannot be or is genuinely disputed must support the motion by citing to particular parts of materials in the record, including ... affidavits ... or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... grant summary judgment." Fed. R. Civ. P. 56(e)(3).

In a summary judgment motion, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings ... [and] affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett,

477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations and citations omitted). If the movant meets this initial burden, then the non-movant has the burden of going beyond the pleadings and designating specific facts that prove that a genuine issue of material fact exists. See id. at 325, 106 S. Ct. at 2554; see Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). A non-movant, however, cannot meet the burden of proving that a genuine issue of material fact exists by providing only "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Little, 37 F.3d 1069, 1075 (5th Cir. 1994). Additionally, in deciding a summary judgment motion, courts "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is when both parties have submitted evidence of contradictory facts." Id. Courts "do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Id.

"A partial summary judgment order is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case." Streber v. Hunter, 221 F.3d 701, 737 (5th Cir. 2000). Partial summary judgment serves the purpose of rooting out, narrowing, and focusing the issues for trial. See Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1415 (5th Cir. 1993).

## II.    Motions to Strike

The Firms move to strike the declarations of Wolfram and Ciolino, two experts of legal ethics, on the grounds that the professors' declarations amount to opinions about the meaning and applicability of the law, specifically Louisiana Rules of Professional Conduct 1.5(d)(1) and 1.8(a). See Record Document 53 at 2, ¶ 7.

Federal district courts serve as "gatekeepers" to the admissibility of both scientific and non-scientific expert testimony. See Kumho Tire v. Carmichael, 526 U.S. 137, 147-49, 119 S. Ct. 1167, 1174 (1999). The admissibility of proffered expert testimony is determined by application of Federal Rule of Evidence 702. See Daubert v. Merrell Dow Pharmaceutical, 509 U.S. 579, 589-90, 113 S. Ct. 2786, 2795 (1993) (stating that Rule 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify"). A witness, who is qualified as an expert, may testify in the form of an opinion or otherwise only if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Federal Rule of Civil Procedure 12(f) states that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[E]xperts cannot assert what law governs an issue or what the applicable law means because that is a function of the court." Fisher v. Halliburton, No. CIV. A. H-05-1731, 2009 WL 5216949, at *2 (S.D. Tex. Dec. 21, 2009); see also Goodman v. Harris Cnty., 571 F.3d 388, 399 (5th Cir.2009) ("[A]n expert may never render conclusions of law.").

In the present action, the affidavits of Wolfram and Ciolino assert that the Louisiana Rules of Professional Conduct 1.5(d)(1) and 1.8(a) apply and that the Firms violated such

rules. Furthermore, their affidavits define the meaning of what constitutes a "domestic relations matter" and a "business transaction." However, as indicated in <u>Fisher</u>, "experts cannot assert what law governs an issue or what the applicable law means." <u>Id.</u> at *2. The judiciary is tasked with determining questions of law, not an expert in legal ethics. <u>See id.</u> Accordingly, the Firms Motions to Strike are **GRANTED**.

### III. Louisiana Rule of Professional Conduct 1.5(d)(1)

"The standards in the Code of Professional Responsibility which govern the conduct of attorneys have the force and effect of substantive law." <u>Succession of Cloud</u>, 530 So.2d 1146, 1150 (La.1988). Contingency fee agreements in Louisiana are governed by Louisiana Rule of Professional Conduct 1.5. Rule 1.5(a) provides in pertinent part that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." LA ST BAR ART 16 RPC Rule 1.5. Rule 1.5(c) provides:

> A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by Paragraph (d) or other law. A contingent fee agreement shall be in a writing signed by the client. A copy or duplicate original of the executed agreement shall be given to the client at the time of execution of the agreement. The contingency fee agreement shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; the litigation and other expenses that are to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be liable whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

<u>Id.</u> In Louisiana, contingency fees are expressly authorized by La. Rev. Stat. § 37:218, which permits an attorney to acquire a contingency fee interest in the subject matter of

litigation, "whether the claim or suit be for money or for property." La. Rev. Stat. § 37:218. In Cloud, the Louisiana Supreme Court noted that contingency fees are not without their problems and lawyers must enter into such agreements in good faith and only when the agreement would benefit the client. Id. at 1150. Nonetheless, the court recognized the importance of such agreements in encouraging lawyers to represent clients with meritorious claims that the clients could not otherwise afford to litigate. Id.

Fox contends that Louisiana Rule of Professional Conduct 1.5(d)(1)'s exception to Rule 1.5(c) applies to the present action rendering the contingency fee agreements void and unenforceable as a matter of law. Fox's argument hinges on the Court finding that the bankruptcy proceedings are a "domestic relations matter," within the meaning of Rule 1.5(c). To support this argument, Fox asserts that the bankruptcy proceedings concerned her community property. Furthermore, Fox asserts that the Firms fee was contingent on Fox obtaining a divorce in Texas, and the Firms assisted her in obtaining the divorce. Rule 1.5(d)(1) provides:

> A lawyer shall not enter into an arrangement for, charge, or collect:
>
> (1)     any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or upon the amount of alimony or support, or property settlement in lieu thereof . . . ."

LA ST BAR ART 16 RPC Rule 1.5. However, the Firms strongly rebut Fox's arguments. The Firms' primary argument is that a bankruptcy proceeding cannot be considered a "domestic relations matter." Therefore, the question before the Court is whether the work done by the Firms on behalf of Fox constituted a "domestic relations matter." If the Court answers this question in the affirmative, then the Firms' agreements with Fox are void

and unenforceable as a matter of law. However, if the Court answers the question in the negative, then the Firms' breach of contract claim can proceed.

Here, the Court holds that the Firms representation of Fox in the bankruptcy proceeding does not equate to a "domestic relations matter" that would bring the Firms within the ambit of Louisiana Rule of Professional Conduct 1.5(d)(1)'s exception to Rule 1.5(c). Bankruptcy is exclusively a matter of federal law whereas the Domestic Relations Exception "divests federal courts of the power to issue divorce, alimony, and child custody decrees." Ankenbrandt v. Richards, 504 U.S. 689, 703, 112 S. Ct. 2206, 2215 (1992). Thus, divorce, alimony, and child custody issues are exclusively the province of state courts. Fox argues that because her claim in the bankruptcy proceeding concerned community property, the bankruptcy proceeding should be recognized by the Court as a "domestically related matter." However, the Bankruptcy Code distinguishes between a federal bankruptcy proceeding, commenced by filing a petition in bankruptcy court under Chapter 11 of the United States Code, and a state-court "domestic relations matter." Specifically, Section 362(b)(2), which addresses the automatic stay in bankruptcy, states that the filing of a bankruptcy petition does not operate as a stay of the commencement or continuation of a civil matter:

> (i)    for the establishment of paternity;
>
> (ii)   for the establishment or modification of an order for domestic support obligations;
>
> (iii)  concerning child custody or visitation;
>
> (iv)   for the dissolution of a marriage, except to the extent that such proceeding seeks to determine the division of property that is property of the estate; or
>
> (v)    regarding domestic violence.

11 U.S.C. § 362(b)(2). Therefore, when one spouse files for bankruptcy, "[a]ll interests of the debtor and the debtor's spouse in community property as of the commencement of the  case" become assets of the bankruptcy estate, subject to the claims of the creditors under  the Bankruptcy Code. 11 U.S.C. § 541(a)(2). However, "domestic relations matters," i.e., divorce, alimony, and custody, remain the exclusive purview of  the state courts and can proceed.

In the present case, although the bankruptcy court obtained jurisdiction over Rosbottom and Fox's community property assets, the bankruptcy court did not, thereby, become a "domestic relations court" and lacked jurisdiction over the parties' divorce, support, or custody issues. From the perspective of the bankruptcy court, Fox was a residual equity owner by virtue of her co-ownership of the assets of bankruptcy estate. See 11 U.S.C. § 363(i). The fact that the legal basis for Fox's co-ownership was the community of acquets and gains arising under Texas law by virtue of her marriage to Rosbottom does not *ipso facto* transform the bankruptcy proceedings into a "domestic relations matter" for the purpose of Rule 1.5(d)(1). This view is shared by the American Bar Association's Lawyers' Manual on Professional Conduct, which, in addressing the scope and applicability of Rule 1.5(d)(1)'s[2] exception explains: "Lawsuits that could loosely be called domestic relations or family law matters but that do not involve the obtaining of a divorce, alimony, or child support are not subject to the ethical prohibition on contingency fees." Public Opinion 05-002, 53 La. B.J. 136 at 152.

---

[2] The Louisiana Rules of Professional Conduct are modeled after the American Bar Association's Model Rules of Professional Conduct.

The Court also notes that Fox has failed to cite to any cases holding that a bankruptcy courts handling of community assets constituted a "domestic relations matter." The Court applying Rule 1.5(d)(1) to the Firms' representation of Fox in the bankruptcy proceedings would be an unwarranted expansion of the Rule, especially when the rationale for the Rule is so plainly absent. The rationale behind Rule 1.5(d)(1) is to eliminate the possibility that the personal interest of the attorney prevents the reconciliation of the spouses. See Aucoin v. Williams, 295 So. 2d 868, 872 (La. App. 3d Cir. 1974). As discussed *supra*, Fox and Rosbottom were engaged in an extremely litigious, protracted, and expensive Texas separation and divorce case which spanned from 2005 through Rosbottom's bankruptcy which was filed in 2009 and culminated in a final divorce decree granted by the Texas divorce court in 2013. During this period, Rosbottom not only defrauded and nearly left insolvent the bankruptcy estate, but also Fox. Due in large part to Fox's reporting of Rosbottom's conduct to the United States Attorney for the Western District of Louisiana, Rosbottom along with his then female companion were indicted, tried, and convicted of bankruptcy fraud. Rosbottom is now incarcerated and is subject to a restitution order in favor of Fox, who now owns outright 100 percent of the enterprise that Rosbottom had built during their marriage. Therefore, the fact that reconciliation was never a likely possibility further militates against Rule 1.5(d)(1)'s applicability. Accordingly, Louisiana Rule of Professional Conduct 1.5(d)(1)'s prohibition does not apply to the Firms' contingency fee agreements with Fox. The Firms' Motion for Partial Summary Judgment is **GRANTED**.

Because the Court determines that the bankruptcy proceedings are not considered a "domestic relations matter" within the meaning of Louisiana Rule of Professional

Conduct 1.5(d)(1), the Court need not address Fox's other arguments on Rule 1.5(d)(1)'s applicability.

## IV.    Louisiana Rule of Professional Conduct 1.8(a)

Louisiana Rule of Professional Conduct 1.8(a) prohibits attorneys from entering into "business transactions" with clients unless a stringent procedure is followed. Rule 1.8(a) provides in pertinent part:

(a)    A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1)    the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2)    the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

(3)    the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

LA ST BAR ART 16 RPC Rule 1.8.

In the present action, Fox argues that the contingency fee agreements with the Firms are unlawful as a matter of law because the agreements violate Louisiana Rule of Professional Conduct 1.8(a) prohibition of attorneys entering into "business transactions" with clients unless certain procedures are followed. First, Fox argues that the contingency fee agreements were a "business transaction." Next, Fox asserts that because the Firms entered into a "business transaction" with Fox, the Firms violated Rule 1.8(a) by not

advising Fox to seek independent counsel. Lastly, Fox argues that the Firms failed to adequately explain to Fox the terms or potential ramifications of the proposed contingency fee arrangement. The Firms argue that the contingency fee agreements comply with Louisiana Rule of Professional Conduct 1.5(c) and the agreement does not result in the Firms entering into a "business transaction" with a client, which would have required the Firms to follow Rule 1.8(a).

"A contingency fee contract is a 'mere interest in the exercise of the power' of mandate and is not a power coupled with an interest in the property." Kinsey v. Dixon, 467 So.2d 862, 864 (La. App. 2d Cir. 1985) (citing Montgomery v. Foreman, 410 So.2d 1160, 1167 (La. App. 3d Cir.1982)). However, Fox argues that when she entered into the 2010 and 2013 agreements, a "business transaction" commenced. Fox cites to an ABA opinion that discusses whether a client issuing an attorney stock in return for his services constitutes a "business transaction" and attempts to equate that opinion to the present situation. See ABA Formal Opinion No. 00-418 (2000). The Court is unpersuaded. When an attorney agrees to render services in return for stock in a corporation, that client is conveying a present interest that will vest presently or once the company is formed. In the present case, it was uncertain as to whether the Firms would receive any distributions from the bankruptcy estate. Furthermore, Fox has failed to cite to any cases that are similar to the present action. However, the Firms have cited to cases that demonstrate what constitutes a "business transaction."

The jurisprudence suggests that loans are the most common type of business, property, or financial transactions that occur between attorneys and clients. For example, the Louisiana Supreme Court found a violation of Rule 1.8(a) where an attorney provided

collateral for a client's business loans without advising the client to seek independent representation. See In re Bradley, 2005-1188 (La. 11/29/05), 917 So.2d 1068, 1079. The court applied Rule 1.8(a) because the lawyer loaned money to, or took a loan from, his client in a transaction that was separate and apart from the lawyer's representation of the client. See id. at 1079. Similarly, when a lawyer guarantees a loan to promote or facilitate a client's business, courts have held that the lawyer participates in a business, property, or financial transaction with a client, and Rule 1.8(a) applies. For instance, in In re Curry, a real estate developer obtained a $12.9 million dollar jury verdict against a bank for breaching its loan commitments for the development of a subdivision. See 2008-2557 (La. 7/1/09), 16 So.3d 1139, 1143. While the verdict was on appeal, the developer and its attorneys agreed to convert from an hourly fee agreement to a contingency fee agreement. See id. at 1143. However, on appeal, the appellate court substantially reduced the verdict and remanded the case to the trial court. See id. The trial court entered a judgment in favor of the bank for $500,000. See id. The developer then appealed. Unable to pay the judgment or obtain a loan to develop the property, the developer approached its attorneys and asked them to guarantee a $950,000 business loan, so that the developer could develop the property and sell the lots. See id. The attorneys agreed to guarantee the loan, and in the course of doing so, again modified their fee agreement, so that the attorneys had an option to collect as their "contingency fee" either one-third of the net profit realized by the developer on the sale of the lots (option one) or one-third of any award to the client in the pending litigation (option two). See id. at 1143-44. The appellate court eventually reinstated a $1.8 million judgment in favor of the developer against the bank. See id. at 1145-46. The attorneys chose option

two under the amended fee agreement, and the developer paid the attorneys a portion of the $600,000 fee due. See id. A dispute arose concerning the fee, and the developer filed a complaint with the Office of Disciplinary Counsel, contending, *inter alia*, that the lawyers had entered into a business transaction with a client in violation of Rule 1.8(a) without advising the developer to seek the advice of independent counsel. See id. at 1147-48. The Louisiana Supreme Court concluded that the "highly unusual" loan guarantee and repayment arrangement amounted to a "business transaction" with the client, which was subject to the requirements of Rule 1.8(a). Id. at 1153. The court reasoned that the "[attorneys'] guaranteed a $950,000 loan to [the developer] from a bank in order to complete the [subdivision] so that lots could be sold" and that the attorneys' fee, at least under option one of the renegotiated fee agreement, "was not conditioned to any degree on the success or failure of the litigation." Id. Under these circumstances, the court concluded, the "unusual nature of the [renegotiated fee agreement] should have prompted [the lawyers] to urge [the developer] to have independent counsel review the arrangement." Id. at 1154.

Furthermore, when a lawyer purchases property from a client, he participates in a business, property, or financial transaction with the client. See In re Baggette, 2009-1091 (La. 10/20/09), 26 So.3d 98, 108. In In re Baggette, the Louisiana Supreme Court found that an attorney violated Rule 1.8(a) when he, through a third-person, purchased his client's interest in a succession without informing the client of the terms of the transaction in writing or giving the client a reasonable opportunity to seek the advice of independent counsel. See id. at 108. In addition to the aforementioned business, property, or financial transactions, investments between a lawyer and a client may implicate Rule 1.8(a). For

example, in In re Singleton, a lawyer induced his client to invest in a mortgage company without disclosing that the lawyer was a part owner in the business. See 96-1631 (La. 11/25/96), 683 So.2d 711. The Louisiana Supreme Court found that the lawyer had violated Rule 1.8(a)'s predecessor, Louisiana Code of Professional Responsibility DR 5-104(A).[3] See id. at 713. In framing the "conflict of interest" which triggered the application of the rule, the court stated that the lawyer obtained money recoveries for his clients and then advised the client to invest in a mortgage company the lawyer co-owned without disclosing his ownership interest. See id. at 711. The court reasoned that because the lawyer and his clients "had 'differing interests,' as that phrase is used in DR 5-104(A), in the transaction," the rule was implicated. Id. at 713. Furthermore, as discussed *supra*, another variety of investment governed by Rule 1.8(a) is when a lawyer accepts stock or a stock options in a client's business in lieu of a cash fee.

Lastly, the final category of transactions subject to Rule 1.8(a) is when a lawyer acquires a security interest over client property (other than that recovered through the lawyer's efforts in the litigation) to secure the payment of the lawyer's fee. See Breeden v. Cella, 2002-0972 (La. App. 4 Cir. 11/26/02), 832 So.2d 1072, 1078. In Breeden, a lawyer had his client execute a note and collateral mortgage to secure payment of the lawyer's legal fees. See id. at 1075. The court refused to enforce the note and mortgage, finding that the security interest violated Rule 1.8(a):

> This alleged collateral mortgage package would clearly be a business transaction between the parties-an attorney-creditor and a client-debtor-and would thus trigger the ethical rule regarding such transactions. Rule 1.8 requires that an attorney inform the client and advise the client to seek

---

[3] DR 5-104(a), which was in effect until Rule 1.8(a) was enacted in 2004, provided that a "lawyer shall not enter into a business transaction with a client if they have differing interests unless the client has consented after full disclosure."

independent legal advice, and obtain the client's written consent. None of those requirements were complied with in this case. [The client] was not informed that the purpose of the notes was to secure [the lawyer's] attorney's fees. [The client] was not advised to consult independent counsel regarding that business transaction. Consequently, [the client's] consent to create such a collateral mortgage package could not conceivably have been obtained.

Id. at 1079 (citations omitted).

None of the aforementioned situations are present in this case. When the Firms entered into the contingency fee agreements with Fox there was uncertainty as to what, if anything, they would receive. The Court admits this case is both complex and unusual. However, the Court finds that when a lawyer and a client enter into a contingency fee agreement, the lawyer does not receive a present interest in the client's property. In other words, there is no present conveyance of a property interest which vests, regardless of the outcome of the representation. Rather, in order to earn his fee, the lawyer must prevail in the litigation against some risk of loss, in which event the lawyer and the client share in the recovery, whether that recovery be cash or property. Like all contingency fee agreements, there was substantial uncertainty as to the success of the litigation and the only thing the Firms agreed to with Fox was a "future hope" that the Firms would be successful in their representation and receive the agreed upon fee as a result of such success. In this case, the Court finds that an ordinary contingency fee agreement was effected between Fox and the Firms pursuant to Louisiana Rule of Professional Conduct 1.5(c).

Fox's argument that a "business transaction" was effected between the Firms and Fox hinges on the 2010 and 2013 agreements expressly calling upon Fox to assign the Firms "an undivided vested interest in the gross proceeds (whether cash or property)

distributed to [Fox]" on account of her rights to the community estate. Fox argues that an "undivided interest" is "[a]n interest held under the same title by two or more persons, whether their rights are equal or unequal in value or quantity." Black's Law Dictionary (10th ed. 2014). Fox asserts that the only "property" from which recovery could be had was Fox's pre-existing one-half share of the community, which was predominately comprised of the various community companies tied up in the bankruptcy estate. Therefore, according to Fox, per the agreements' plain language, the Firms contracted with Fox for partial title to her property. However, the Court rejects this argument. The Court has examined the contingency fee agreements and finds that the agreements comply with Rule 1.5(c). The 2010 agreement states that the Firms will receive:

> an undivided vested interest in the gross proceeds (whether cash or property) (the "Gross Proceeds") distributed to [Fox] either for [her] claims against the bankruptcy estate or as an equity owner of the bankruptcy estate of Harold L. Rosbottom, Jr., the following: 25% if the value of the Gross Proceeds is $3,000,000 or less, 30% if the value of the Gross Proceeds is between $3,000,000 and $5,000,000, and 35% if the value of the Gross Proceeds is more than $5,000,000 . . . .

The 2013 agreement increases the percentage to 40 percent whereby the Firms will each be entitled to 20 percent each. The fact that Fox had community property companies that were potentially subject to the agreements does not *ipso facto* bring such agreements within the realm of Rule 1.8(a). Once the case was closed, the Firms recognized that the 2013 agreement allowed the Firms to take 40 percent control of all estate assets. See Record Document 42-6 at 9. However, the Firms acknowledged that doing so would not benefit the Firms or LTSG so the Firms proposed an alternate agreement that allowed Fox to retain 100 percent ownership of the companies, but also honored the spirit of the contingency fee agreement. See id. at 9-21. Accordingly, the Firms structured the

agreement to where the Firms would receive 40 percent of any distributions of property or cash that Fox received rather than any outright ownership in the companies. See id. At this point in time, the Firms properly advised Fox to seek the advice of independent counsel. See id. at 9. However, at the time the Firms entered into the 2010 and 2013 agreements, it was not only indefinite, but very unlikely the agreements would result in the Firms potentially becoming a co-owner of LTSG. Advising a client to seek independent counsel each time a contingency fee agreement is entered into would have negative impact on such agreements and would not serve the purpose of the rule. Fox also argues that the Firms did not explain to her the implications of such agreements. The Court rejects this argument. After review of extensive email correspondence between Fox and the Firms, the Court notes that the Firms were always willing to answer any questions posed by Fox relating to such agreements and the litigation as a whole. Thus, it appears to the Court, by virtue of the Summary Judgment record, that Fox was very aware of the implications of entering into the agreements with the Firms. Fox, before entering into the initial contingency fee agreement stated "[j]ust remember....the more $ I get, the more $ you get." See Record Document 54-1 at 4. Therefore, Fox was well informed of the implications of her actions. Accordingly, the Court finds that the Firms did not enter into a "business transaction" with Fox that would implicate Louisiana Rule of Professional Conduct 1.8(a).

Lastly, upon examination of the record evidence, it seems to the Court that the Firms did a masterful job in their representation of Fox. However, it should be noted that the Court does not address the reasonableness of the contingency fee agreements, which

is an issue for the trier of fact to decide.[4] Furthermore, because the Court has **GRANTED** the Firms Motions for Partial Summary Judgment, Fox's Cross-Motion for Partial Summary Judgment is **DENIED**. Fox's Cross-Motion for Partial Motion for Summary Judgment relies on Louisiana Rules of Professional Conduct 1.5(d)(1) and 1.8(a), which this Court has found inapplicable.

## CONCLUSION

The Firms' Rule 56 Motions for Partial Summary Judgment (Record Documents 43 and 49) are **GRANTED**. Fox's Motion for Cross-Motion for Partial Summary Judgment (Record Document 42) is **DENIED**. Furthermore, the Firms' Motions to Strike (Record Documents 53 and 56) are **GRANTED**.

In light of this Court's Memorandum Ruling finding that the Louisiana Rules of Professional Conduct 1.5(d)(1) and 1.8(a) are inapplicable to the present case, the Court, *sua sponte*, holds that Fox's counterclaim for breach of fiduciary duty fails as a matter of law. Such claim is hereby **DISMISSED**. Fox's breach of fiduciary duty counterclaim is grounded in the applicability of Rule 1.5(d)(1) and 1.8(a). See Record Document 75. The applicability of such rules, as highlighted *supra*, has been thoroughly briefed and the issue has now been decided by the Court. Accordingly, Fox's counterclaim is **DISMISSED** and the Firms' Motion to Dismiss (Record Document 71), which was filed on the grounds of peremption, is **DENIED AS MOOT**, as there was no need for the Court to reach the issue of timeliness.

---

[4] Despite this Court ruling on the applicability of Louisiana Rules of Professional Conduct 1.5(d)(1) and 1.8(a), the reasonableness of the contingency fee agreements pursuant to Rule 1.5(a) is not presently before the Court. Accordingly, the Firms' breach of contract claim shall proceed.

An Order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, on this the 20th day of March, 2018.

S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT