**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

WIENER, WEISS & MADISON, A       CIVIL ACTION NO. 16-0850
PROFESSIONAL CORPORATION,
ET AL.

VERSUS                       JUDGE S. MAURICE HICKS, JR.

LESLIE B. FOX             MAGISTRATE JUDGE PEREZ-
MONTES

**MEMORANDUM RULING**

Before the Court are pending motions filed by the parties pursuant to Federal Rule of Civil Procedure 56: (1) Plaintiffs Wiener, Weiss & Madison, A Professional Law Corporation, and Kantrow, Spaht, Weaver & Blitzer's (A Professional Law Corporation) (collectively "the Firms") Motion for Summary Judgment (Record Document 127); and (2) Defendant Leslie B. Fox's ("Fox") Motion for Partial Summary Judgment (Record Document 134). There are also pending <u>Daubert</u> motions filed by the Firms, <u>see</u> Record Documents 142 and 143, in addition to a Motion to Strike filed by Fox, <u>see</u> Record Document 152. The Firms seek dismissal of all of Fox's claims. For the reasons set forth below, the Firms' Motion for Summary Judgment is **GRANTED** and Fox's Motion for Partial Summary Judgment is **DENIED**. Additionally, the Firms' <u>Daubert</u> motions are **GRANTED** and Fox's Motion to Strike is **DENIED**.

## I.    BACKGROUND

This is an action for breach of a Louisiana contingency fee contract between the Firms and their former client, Fox. On July 6, 2005, Fox filed for divorce from her husband, Harold Rosbottom, Jr. ("Rosbottom"), in the 256th Judicial District Court of Dallas County, Texas (the "Texas Divorce Proceeding"). <u>See</u> Record Document 42-2 at 14. Throughout

the Texas Divorce Proceeding, Rosbottom repeatedly disregarded court orders, including orders regarding the disclosure of certain financial information and other data pertaining to his business interests. See id.; see Record Document 42-3 at 8. As a result, on June 9, 2009, the Texas district court orally appointed a receiver to assume control over the community estate. See Record Document 42-3 at 8, 1. However, within hours of the court's ruling, Rosbottom filed for Chapter 11 bankruptcy in the Western District of Louisiana. See id. at 1.

The bankruptcy consisted of two related proceedings, namely:

(a)  a Chapter 11 bankruptcy filed by Rosbottom, see In re Harold L. Rosbottom, Jr., No. 09-11674 (W.D. La. June 9, 2009) ("BR Docket No. 09-11674"); and

(b)  a Chapter 11 bankruptcy proceeding filed by Caddo-Bossier Gaming Company, LLC (an entity owned by Fox and Rosbottom), see In re Caddo-Bossier Gaming Company, LLC, No. 09-11673 (W.D. La. June 9, 2009).

(collectively "the bankruptcy proceedings"). See Record Document 1 at 2–3. The bankruptcy proceedings had the effect of transferring all matters relating to the couple's community property, including community property division, from the Texas family court to the Louisiana bankruptcy court. See id. at 3–5; see Record Document 42-2 at 14–15. Additionally, Fox had claims against Rosbottom's bankruptcy estate for delinquent monthly support payments of prior support orders of the Texas family court. See Record Document 1 at 1, 4.

On June 16, 2009, Wiener, Weiss & Madison ("WWM") agreed to represent Fox in the bankruptcy proceedings and any and all matters relating to those bankruptcy cases for the purpose of protecting Fox's interest in the community estate. See id. at 2; see Record Document 42-3 at 26. WWM recommended that Fox also retain Kantrow, Spaht,

Weaver & Blitzer ("KSWB"), to which Fox consented (collectively referred to as "the Firms"). <u>See</u> Record Document 42-3 at 29–34; <u>see</u> Record Document 42-4 at 1. As set forth in the engagement letters, the Firms agreed to represent Fox on an hourly fee basis. <u>See</u> Record Document 42-3 at 26–34; <u>see</u> Record Document 42-4 at 1. However, recognizing that Fox's assets were tied up in the bankruptcy proceedings, the Firms agreed to seek their fees directly from the bankruptcy court, to be payable out of the Rosbottom bankruptcy estate. <u>See</u> Record Document 42-3 at 26.

"The Firms jointly pursued Fox's community property, support, and other interests in the bankruptcy proceedings and began incurring substantial fees and expenses." Record Document 49-3 at 2, Declaration of R. Joseph Naus ("Naus"). For example, "the Firms commenced an investigation for purposes of locating assets and liabilities that were not included on Rosbottom's bankruptcy schedules." <u>Id.</u> As a result of the Firms' efforts, with the help of Fox and others, the Firms identified and located "community assets of significant value that Rosbottom had illegally and fraudulently concealed, both pre- and post-bankruptcy, thereby substantially enhancing the value of the Rosbottom bankruptcy estate for the benefit of Fox and the other creditors." <u>Id.</u> Additionally, "the Firms' investigation revealed that Rosbottom had wasted and mismanaged the assets of the community both prior to and during the pendency of the bankruptcy proceedings." <u>Id.</u>

Based on the extensive evidence the Firms developed, the Firms "filed a motion to remove Rosbottom as the debtor in possession and appoint a Chapter 11 bankruptcy trustee in his place." <u>Id.</u> On February 19, 2010, the bankruptcy court appointed a Chapter 11 Trustee (the "Trustee") to assume control of Rosbottom's business affairs and assets and to otherwise reorganize the significant debts owed by Rosbottom individually and the

many corporations, partnerships, and limited liability companies under his direction or control. <u>See</u> Record Document 42-5 at 1, 20; <u>see</u> Record Document 42-7 at 12.

With the appointment of the Trustee, the Firms achieved Fox's initial objectives of ending Rosbottom's fraudulent control over the bankruptcy estate and enforcing her support obligations. <u>See</u> Record Document 49-3 at 3. However, the Firms had not been paid for their services, and virtually all of Fox's assets remained tied up in the bankruptcy. In the first eight months of representation, the Firms billed 3,361.75 hours of time and $1,216,656.92 in fees and expenses to Fox. <u>See</u> Record Document 42-8 at 18, 49–51. Accordingly, "in line with their engagement letters, the Firms moved the bankruptcy court for an order, pursuant to 11 U.S.C. § 331, requiring that the bankruptcy estate pay the Firms' professional fees as administrative expenses." Record Document 49-3 at 3. "However, the bankruptcy court denied that motion, holding the Bankruptcy Code did not authorize the court to pay the professional fees of a non-debtor spouse or creditor like Fox." <u>Id.</u> Following this ruling, "the Firms submitted a Substantial Contribution Application to the bankruptcy court pursuant to 11 U.S.C. § 503(b)(3)(D)." <u>Id.</u> "In their Substantial Contribution Application, the Firms contended that the Rosbottom bankruptcy estate should pay the Firms $1.2 million for their fees and expenses incurred through February 28, 2010, because their work—culminating in the appointment of the Trustee—had substantially enhanced the value of, and preserved, the bankruptcy estate for the benefit of the creditors as a whole." <u>Id.</u> The bankruptcy court ultimately approved the Firms' Substantial Contribution Application, and the Firms received payment for all of their fees for its work performed through February 28, 2010. <u>See</u> Record Document 33 at 4.

Following the appointment of the Trustee, Fox sought the Firms' assistance in:

(a)     working with the Trustee to preserve and protect her equity interest in the bankruptcy estate and to identify additional assets that Rosbottom had concealed;

(b)     enforcing her rights against the bankruptcy estate for monthly support payments;

(c)     defending against various creditors' claims made against her, individually;

(d)     investigating her and her children's interest in various entities ostensibly owned by the children in which Rosbottom had attempted to divert millions of dollars of community assets; and

(e)     assisting her with the Trustee's demand that she vacate her home in Dallas and liquidate its contents.

Record Document 49-3 at 3–4. "In addition, Fox needed assistance in connection with a criminal investigation that had been initiated against Rosbottom by the United States Attorney for the Western District of Louisiana." Id. at 4. However, since virtually all of Fox's assets were the property of Rosbottom's bankruptcy estate and she was receiving no support payments from her former husband, Fox did not have the means to pay the Firms' fees and expenses for the Firms' continued representation. See id. Therefore, in November 2009, Fox requested that the Firms submit a proposal to her for her consideration concerning the fees. See id. On April 29, 2010, the Firms tendered to Fox a new fee agreement (the "2010 agreement"). See Record Document 42-4 at 4–5. The 2010 agreement, which was to be retroactively effective as of March 1, 2010, altered the fee arrangement between Fox and the Firms from an hourly arrangement to a contingency fee arrangement "on a going forward basis." Id. at 4. The 2010 agreement stated that "[a]t the outset of the case, it was hoped that the bankruptcy case would be relatively short. However, we currently cannot estimate when the case might end and what the results might be." Id. The 2010 agreement proposed that Fox grant to the Firms:

an undivided vested interest in the gross proceeds (whether cash or property) (the "Gross Proceeds") distributed to [Fox] either for [her] claims against the bankruptcy estate or as an equity owner of the bankruptcy estate of Harold L. Rosbottom, Jr., the following: 25% if the value of the Gross Proceeds is $3,000,000 or less, 30% if the value of the Gross Proceeds is between $3,000,000 and $5,000,000, and 35% if the value of the Gross Proceeds is more than $5,000,000 . . . .

Id. On May 3, 2010, Fox and the Firms entered into a written contingency fee agreement. See Record Document 49-3 at 4.

"With the bankruptcy estate now under the Trustee's sole management and control, the Firms filed an adversary proceeding on behalf of Fox against Rosbottom, seeking an inequitable distribution of the equity of the bankruptcy estate because of Rosbottom's fraud, waste, and mismanagement of the community." Id. "Following the entry of a preliminary injunction in the adversary proceeding, Rosbottom agreed to a settlement, whereby any remaining equity in the bankruptcy estate would be allocated between him and Fox, 25 percent and 75 percent, respectively." Id. However, the Firms, with the assistance of others, thereafter discovered that Rosbottom was continuing to conceal community assets and the Firms moved the bankruptcy court to set aside the settlement. See id.

On March 22, 2013, while the motion to set aside the settlement was pending, the Trustee proposed a plan of reorganization (the "Plan"). See Record Document 42-5 at 1. The Plan included language that entitled Fox to 100 percent of the equity of the bankruptcy estate due to Rosbottom's conduct, which included a 100 percent equity interest in Louisiana Truck Stop and Gaming, LLC (referred to in the Plan as ABC Holding, LLC and hereinafter referred to as "LTSG"). See Record Document 1 at 14; see Record Document 42-5 at 28–30.

"On May 1, 2013, the bankruptcy court confirmed the Plan, with the result that, after payment of the claims of all of the creditors, 100 percent of the bankruptcy estate's equity would become vested in Fox, subject to the terms and conditions of the Plan and the Trustee's continued control and administration." Record Document 49-3 at 5. One of the conditions of the Plan required Fox to finalize her divorce from Rosbottom in order to become vested. The Plan stated that:

> After entry of a final unappealable divorce decree and community partition ("Divorce Condition"), the Trustee will agree to transfer the membership interests of [LTSG] to [Fox], subject to the terms of this Plan . . . . Prior to the Divorce Condition, [Fox] shall have no right or claim, vested or otherwise, to the membership interests in [LTSG] . . . .

Record Document 42-5 at 28. Accordingly, on May 17, 2013, Fox represented by her Texas divorce attorney, Michael DeBruin, appeared for a hearing in the divorce action whereby the judge entered a final divorce decree. See Record Document 43-4 at 4. Nonetheless, the bankruptcy estate still had substantial debt remaining and liquidation of the estate by the Trustee remained a possibility. See Record Document 49-3 at 5. Therefore, it was still uncertain if Fox would receive any distributions from the estate. See id.

"Although the original scope of the Firms' work had largely been concluded, Fox desired the Firms to continue to represent her during the post-confirmation period in an effort to preserve and maximize the value of her expected equity interest in the bankruptcy estate, to avoid the Trustee's sale of the estate's assets, and generally to assist her in matters related to the Plan." Id. Specifically, Fox wanted the Firms to help her:

    (a)    raise money by selling a portion of her equity in the bankruptcy estate to an investor who could help her manage the gaming assets,

(b)     secure a loan to buy out the creditors before the deadline imposed by the Plan, and/or

(c)     otherwise help her end the Trustee's expensive administration, allowing her to come into full and unfettered possession of the estate's assets.

Id. at 5–6. "After consultation with Fox, the Firms agreed to continue to represent her with respect to these post-confirmation and other matters." Id. at 6. On May 29, 2013, Fox and the Firms modified their prior contingency fee agreement. The amended contingency fee agreement provided in pertinent part:

> Pursuant to the telephone conversation that David and I [David Rubin and Chip Naus] had with you on Friday, May 24, 2013, this will serve to confirm the modification of the prior contingent fee arrangement between you (signed by you on May 3, 2010) and [the Firms]. For the reasons we discussed in our telephone conversation and pursuant to your agreement, the Firms collectively will be paid a contingency fee of 40%, 20% to each, based on the work that the Firms have performed on your behalf from and after March 1, 2010, and will continue to perform on your behalf in connection with your interest and rights under the confirmed plan or reorganization in the Harold L. Rosbottom, Jr. bankruptcy case, including without limitation as the 100% equity owner of ABC Holding, L.L.C. Accordingly, pursuant to the modified contingent fee agreement, which replaces the prior agreement you signed with the Firms on May 3, 2010:

> You hereby assign, set over, and grant jointly to the Firms an undivided vested interest in the gross proceeds (whether cash or property) (the "Gross Proceeds") distributed to you on or on account of your rights under the confirmed plan of reorganization in the Harold L. Rosbottom bankruptcy case, including without limitation as the 100% equity owner of ABC Holding, L.L.C. (the "Agreed Fees"). In addition to the payment of the Agreed Fees, you also agree to pay all costs incurred by the Firms in their representation of you, such as copying costs, travel costs, experts, accountants, consultants, or the like.

> In consideration for your agreement to increase the contingency fee from 35% to 40%, the Firms will not seek to recover, as part of its contingency fee, any portion of the salary paid to you on account of your 100% equity interest in ABC Holding, L.L.C. from June 1, 2013, through May 31, 2014, and the Firms also will continue to work on your behalf to maximize the value of your interest in ABC Holding, L.L.C. and any other interest you have

under the confirmed plan of reorganization in the bankruptcy case of Harold L. Rosbottom, Jr.

David and I sincerely appreciate your continued trust and confidence in us, and we appreciate your willingness to enter into this modified contingent fee agreement in order to compensate the Firms for the work we have done and will continue to do on your behalf . . . .

Record Document 42-6 at 7–8.

Over the next two years, the condition of the bankruptcy estate improved to the point that Fox and the bankruptcy estate, with the assistance of the Firms, were able to obtain two loans sufficient to pay off the remaining creditors. See Record Document 1 at 19; see Record Document 49-3 at 6. This allowed Fox, upon approval of the Louisiana State Police Department as to Fox's ownership of the gaming assets, to assume total management, possession, ownership, and control of 100 percent of the bankruptcy estate's assets, free and clear of the Plan's restrictions and the bankruptcy creditors' claims. See Record Document 49-3 at 6; see id. at 7.

"In late 2015, with the Firms work substantially completed and with Fox now receiving compensation from the bankruptcy estate, the Firms commenced discussions with Fox concerning the implementation of their contingency fee agreement." Id.; see Record Document 42-6 at 9–10. "In January 2016, the Firms sent Fox a proposed implementation agreement and advised her in writing to seek the advice of independent counsel regarding the proposed agreement." Record Document 42-6 at 9–10; see id. at 11. "Shortly thereafter, Fox ceased communications with Firms." Id. Fox informed the Firms, through separate counsel, that she declined to accept the proposed implementation agreement and that she believed the Firms' contingency fee agreement

was unenforceable." Id. "Thereafter, the Firms withdrew as Fox's counsel in the Bankruptcy Proceedings." Id.

On June 16, 2016, the Firms filed suit against Fox for breach of the contingency fee agreements. See Record Document 1 at 21. Fox answered the Firms' complaint and asserted, among other claims, that the Firms breached their fiduciary duty to Fox and that the 2010 and 2013 agreements were unenforceable for violating certain rules of the Louisiana Rule of Professional Conduct, specifically Rules 1.5(d)(1) and 1.8(a). See Record Document 30 at 22–23. On March 20, 2018, after the parties filed cross-motions for partial summary judgment on these issues, the Court entered a ruling granting partial summary judgment in favor of the Firms, as well as dismissing Fox's fiduciary duty claim. See Record Document 81 at 27.

Thereafter, the Firms filed the present Motion for Summary Judgment regarding the enforceability and reasonableness of the contingency fee agreement, in addition to the related issue of the reasonableness of the two fee modifications. See Record Document 127 at 3–4. In response, Fox filed a Motion for Partial Summary Judgment in which she contends that the contingency fee agreement is ambiguous and unenforceable and, accordingly, requests the Court to enter a take nothing judgment on the Firms' breach of contract claims asserted against her. See Record Document 134 at 1–2.

## II.    LAW AND ANALYSIS

### A.    Qualifications of the Parties' Expert Witnesses

The Court first addresses the evidentiary motions relevant to the instant motions for summary judgment, namely the Firms' Daubert motions to exclude the testimony of Fox's expert witnesses, Stephen A. Beck and Charles W. Wolfram, see Record

Documents 142 and 143, as well as Fox's Motion to Strike the testimony of the Firms' expert witness, R. Patrick Vance ("Vance"), <u>see</u> Record Document 152. The Firms argue that Fox's experts are not qualified to testify regarding the issue of whether the Firms breached the applicable standard of care for attorneys practicing in Louisiana by entering into the contingency fee agreement with Fox. <u>See</u> Record Document 142 at 2. In her Motion to Strike, Fox asserts several objections to Vance's testimony, including her argument that Vance's proffered testimony is unreliable and consists of legal conclusions. <u>See</u> Record Document 152 at 2.

Federal district courts serve as "gatekeepers" to the admissibility of both scientific and non-scientific expert testimony. <u>See</u> <u>Kumho Tire v. Carmichael</u>, 526 U.S. 137, 147–49, 119 S. Ct. 1167, 1174 (1999). The admissibility of proffered expert testimony is determined by application of Federal Rule of Evidence 702. <u>See</u> <u>Daubert v. Merrell Dow Pharmaceutical</u>, 509 U.S. 579, 589–90, 113 S. Ct. 2786, 2795 (1993) (stating that Rule 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify"). A witness, who is qualified as an expert, may testify in the form of an opinion or otherwise only if:

> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of an expert's testimony bears the burden of proving that it meets the requirements of Rule 702. <u>Moore v. Ashland Chem., Inc.</u>, 151 F. 3d 269,

276 (5th Cir. 1998). Whether these elements are met is a preliminary question for the district court to decide under Fed. R. Evid. 104(a).

In Louisiana, the standard of care for attorney conduct is governed by the locality standard established in Ramp v. St. Paul Fire and Marine Ins. Co., which held that an attorney "is obligated to exercise at least that degree of care, skill, and diligence which is exercised by prudent practicing attorneys in his locality." 269 So. 2d 239, 244 (La. 1972). This standard has been reaffirmed, both by the Louisiana Supreme Court and appellate courts, see MB Industries, LLC v. CNA Ins. Co., 11-303 (La. 10/25/11), 74 So. 3d 1173, 1184, as well as the Fifth Circuit, see Curb Records v. Adams & Reese, LLP, 1999 WL 1240800, at *4 (5th Cir. 1999). In addition, courts have applied this standard to actions involving contingency fee agreements. See, e.g., Reed v. Verwoerdt, 490 So. 2d 421, 425–27 (La. App. 5th Cir. 1986). Further, courts frequently accept attorneys as experts to testify regarding the reasonableness of attorney's fees and the applicable standard of care in such cases. See, e.g., Primrose Operating Co. v. National American Ins. Co., 382 F.3d 546, 562–64 (5th Cir. 2004).

In this case, it is undisputed that neither of Fox's experts are, nor have ever been, licensed to practice law in Louisiana. See Record Document 142-4 at 6; Record Document 143-4 at 4. Additionally, neither of them has sufficient contacts with Louisiana-based firms or attorneys to otherwise render them qualified to opine as to either the applicable standard of care or the reasonableness *vel non* of the parties' contingency fee agreement. See Record Document 142-4 at 7; Record Document 143-4 at 9. Therefore, the opinions of Fox's experts regarding such issues are precluded from consideration for

purposes of this case. Accordingly, the Firms' <u>Daubert</u> motions (Record Documents 142 and 143) are **GRANTED**.

In contrast, the Firms' expert, Vance, is a licensed attorney in Louisiana and has over forty years of experience practicing in this jurisdiction. <u>See</u> Record Document 127-11 at 4 (showing that Vance was admitted to the Louisiana bar in 1975). Additionally, Vance has been admitted as an expert witness in numerous state and federal courts to opine as to the applicable standard of care and the reasonableness of attorney fee agreements. <u>See id.</u> at 42–43. Here, based on the foregoing case law and Vance's extensive experience practicing in Louisiana, the Court determines that Vance is qualified to render an opinion regarding the governing standard of care and the reasonableness of the Louisiana contingency fee agreement at issue. Furthermore, because the Court only considers Vance's opinions to the extent they concern these issues, Fox's additional objections in her Motion to Strike are not addressed. <u>See</u> Record Document 152 at 2–3. Accordingly, Fox's Motion to Strike (Record Document 152) is **DENIED**.

### B.    Summary Judgment Standard

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Quality Infusion Care, Inc. v. Health Care Serv. Corp.</u>, 628 F.3d 725, 728 (5th Cir. 2010).[1] A genuine dispute of material fact exists if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. <u>See</u> <u>Geoscan, Inc. of Texas v. Geotrace Techs., Inc.</u>, 226 F.3d 387, 390 (5th Cir. 2000).

---

[1] The Court notes that amended Rule 56 requires that there be "no genuine <u>dispute</u> as to any material fact," but this change does not alter the court's analysis. Fed. R. Civ. P. 56(a) and advisory committee's note (2010) (emphasis added).

During this stage, courts must look to the substantive law underlying the lawsuit in order to identify which facts are "material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof [at trial]." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986)). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). The Fifth Circuit has cautioned that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy" the nonmovant's burden in a motion for summary judgment. Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005).

In reviewing a motion for summary judgment, the court is to view "the facts and inferences to be drawn therefrom in the light most favorable to the non-moving party." Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp., Inc., 292 F.3d 471, 478 (5th Cir. 2002); Harris v. Serpas, 745 F.3d 767, 771 (5th Cir. 2014). The court should not, however, in the absence of any proof, presume that the nonmoving party could or would prove the necessary facts. See Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

## C.    Enforceability of the Contingency Fee Agreement

The primary dispute at issue is whether the contingency fee agreement is reasonable under Louisiana Rule of Professional Conduct 1.5 and therefore enforceable between the parties. The Louisiana Supreme Court has previously stated that "[t]he standards in the Code of Professional Responsibility which govern the conduct of attorneys have the force and effect of substantive law." Succession of Cloud, 530 So. 2d 1146, 1150 (La. 1988). Contingency fee agreements in Louisiana are governed by Rule 1.5 of the Louisiana Rules of Professional Conduct. Rule 1.5(a) provides in pertinent part that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." La. Rules of Prof'l Conduct 1.5(a). Further, Rule 1.5(c) provides:

> A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by Paragraph (d) or other law. A contingent fee agreement shall be in a writing signed by the client. A copy or duplicate original of the executed agreement shall be given to the client at the time of execution of the agreement. The contingency fee agreement shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; the litigation and other expenses that are to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be liable whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

Id. 1.5(c). In Louisiana, contingency fees are expressly authorized by Louisiana Revised Statutes Section 37:218, which permits an attorney to acquire an interest in the subject matter of litigation, "whether the claim or suit be for money or for property." La. R.S.

37:218.[2] In <u>Cloud</u>, the Louisiana Supreme Court noted that contingency fees are not without their concerns and thus lawyers must enter into such agreements in good faith and only when the agreement would benefit the client. 530 So. 2d at 1150. Nonetheless, the court recognized the importance of such agreements in encouraging lawyers to represent clients with meritorious claims that the clients could not otherwise afford to litigate. <u>Id.</u>

The Court proceeds to address the parties' arguments regarding both the reasonableness of the contingency fee agreement and the two contingency fee modifications. First, however, the Court considers Fox's contentions that the contingency fee agreement is ambiguous and "incurably vague." Record Document 139-3 at 10.

### 1.    Whether the Contingency Fee Agreement Is "Incurably Vague"

As an initial starting point, the Court addresses Fox's claim that the contingency fee agreement is unenforceable due to, *inter alia*, the agreement being ambiguous and "incurably vague," the agreement's omission of material terms, and the absence of a meeting of the minds between the parties regarding the agreement, all of which, according to Fox's theory, render it "void for vagueness." <u>Id.</u>; Record Document 134-1 at 7, 10–11. This argument is meritless for several reasons. Under Louisiana law, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. C.C. art. 2046. Consequently, parol or extrinsic evidence is generally inadmissible on the issue of intent.

_____

[2] The statute also provides that "[t]he term 'fee', as used in this Section, means the agreed upon fee, whether fixed or contingent, and any and all other amounts advanced by the attorney to or on behalf of the client, as permitted by the Rules of Professional Conduct of the Louisiana State Bar Association." La. R.S. 37:218 (quotations omitted).

See <u>Blanchard v. Pan-OK Production Co., Inc.</u>, 32,764 (La. App. 2d Cir. 4/5/00), 755 So. 2d 376, 381. However, when the terms of the written contract are ambiguous, the Court may look beyond the four corners of the document to ascertain the parties' intent. <u>See id.</u> "A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue or when the language used in the contract is uncertain or is fairly susceptible to more than one interpretation." <u>Id.</u>

Here, the Court finds that the contingency fee agreement is not ambiguous with regard to its terms or effects. First, while this issue was not specifically addressed in its prior ruling regarding this case due to neither party having raised it, the Court concluded there that the same agreement complied with Rule 1.5(c). <u>See</u> Record Document 81 at 25. Additionally, the fee agreement almost mirrors the exact language of Louisiana Revised Statutes Section 37:218 describing the nature of a contingency fee itself when it states that the Firms will be provided a forty percent contingency fee in the "gross proceeds (<u>whether cash or property</u>) . . . distributed to [Fox] on or on account of [Fox's] rights under the confirmed plan of reorganization in the . . . bankruptcy case[.]" Record Document 134-1 at 8 (emphasis added); <u>see also</u> La. R.S. 37:218 (allowing an attorney to "acquire as his fee an interest in the subject matter of a suit . . . <u>whether the claim or suit be for money or for property</u>") (emphasis added). Given that the fee agreement specifically provides both the percentage of the Firms' contingency fee and the assets to which it can apply, Fox's contention that the fee agreement "omits material terms" sufficient to render it "void for vagueness" are without merit. Record Document 134-1 at

7, 11.[3] Furthermore, even if the fee agreement was found ambiguous, an examination of the record evidence, i.e., parol evidence, as to the parties' intent and understanding of the fee agreement would render the same conclusion; the extrinsic evidence regarding this issue is further addressed below in Section II.C.2, infra.

### 2. Whether the Fee Agreement Modifications Were "Fair and Reasonable"

The first of the two issues on which the Firms' Motion for Summary Judgment is based is whether the two fee agreement modifications described herein were "fair and reasonable" to Fox. Record Document 127 at 4. Similar to the analysis that governs the second issue regarding the reasonableness of the contingency fee itself, discussed below in Section II.C.3, infra, modifications to fee agreements must be "fair and reasonable to the client under the circumstances in which it was entered." Restatement (Third) of the Law Governing Lawyers § 18. In order to make this showing, the attorney must satisfy two requirements: (1) that the "client was adequately aware of the effects and any material disadvantages of the proposed contract, including, if applicable, circumstances concerning the need for modification"; and (2) that the "client was not pressured to accede" to the modification to avoid the "problems of changing counsel, alienating the

---

[3] The Court also finds that the phrase "gross proceeds" provided in the contingency fee agreement is not ambiguous. See supra p. 8. To the extent Fox argues that she was not informed of the meaning of this phrase, the email correspondence in the record between Fox and the Firms clearly shows otherwise. See Record Document 127-3 at 118–19; see also Wampold v. E. Eric Guirard & Associates, 442 F.3d 269, 272 (5th Cir. 2006) (finding that the phrase "gross proceeds" was unambiguous in meaning "the total amount of money received without adjustment for deductions or subtractions").

lawyer, missing a deadline or losing a significant opportunity in the matter." Id.; Record Document 139-3 at 22; Record Document 127-1 at 19–20.[4]

In this case, the record evidence clearly establishes that the fee agreement modifications not only were reasonable, but also were greatly beneficial to Fox throughout the bankruptcy proceedings and afterward. Regarding the first fee modification, it is undisputed that Fox, after appointment of the Trustee, did not have the means to pay the Firms' fees and expenses under the original hourly fee agreement. See Record Document 127-2 at 2; Record Document 139-1 at 2. Because of Fox's predicament, both her and the Firms discussed options for a new fee agreement moving forward, including the Firms' initial proposal of a thirty-five percent contingency fee. See Record Document 49-3 at 4–5. However, to accommodate Fox's request, the Firms agreed to a "stairstep" fee instead. The Firms would be entitled to between twenty-five and thirty-five percent of the gross proceeds, "whether in cash or property," Fox received from the bankruptcy estate, depending on the recovered assets' value. Record Document 127-4 at 33–34. In addition, the extensive email correspondence between Fox and the Firms in the record clearly shows that Fox was more than "adequately aware" of the implications and effects of the proposed contingency fee agreement. Restatement § 18. Indeed, this Court has already rejected Fox's claim that the Firms failed to sufficiently explain the relevant details of both agreements in its prior ruling:

> Fox also argues that the Firms did not explain to her the implications of such agreements. The Court rejects this argument. After review of extensive email correspondence between Fox and the Firms, the Court notes that the

---

[4] While it is unclear whether this analysis has been explicitly adopted in Louisiana for enforcing fee agreement modifications, it has been adopted by most jurisdictions. See Record Document 127-1 at 20 n.56. Additionally, both parties cite to the analysis in their briefs. See id. at 19–20; see Record Document 139-3 at 22.

> Firms were always willing to answer any questions posed by Fox relating to such agreements and the litigation as a whole. <u>Thus, it appears to the Court, by virtue of the Summary Judgment record, that Fox was very aware of the implications of entering into the agreements with the Firms</u>. Fox, before entering into the initial contingency fee agreement stated "[j]ust remember . . . the more $ I get, the more $ you get." Therefore, Fox was well informed of the implications of her actions.

Record Document 81 at 25–26 (emphasis added). Furthermore, the level of detail and sophistication in Fox's questions to the Firms regarding the fee agreements' terms and scope further demonstrates her understanding of the implications of entering into the agreements and her free consent to do so. <u>See</u> Record Document 127-3 at 109–10.

The same is true with respect to the second fee agreement modification whereby the parties agreed to replace the graduated "stairstep" fee with a flat forty percent contingency fee, with twenty percent going to each firm. <u>See</u> <u>supra</u> Section I. First, even though the bankruptcy phase had concluded, Fox requested the Firms to continue to represent her during the post-confirmation phase, <u>see</u> Record Document 49-3 at 5. Nothing in the record suggests that she was coerced or pressured in agreeing to the new contingency fee agreement. Additionally, the five-percent increase from the initial fee agreement was not unreasonable or unfair to Fox: the second fee agreement significantly expanded the scope of (and, thus, the work involved in) the Firms' representation of Fox, <u>see</u> Record Document 81 at 8; Record Document 127-6 at 47–54, and, further, the Firms agreed (at Fox's request) not to take their contingency fee from Fox's salary for a year, <u>see</u> Record Document 81 at 9. Furthermore, the Firms have provided the opinion of their standard-of-care expert that both fee modifications were fair and reasonable to Fox under the circumstances. <u>See</u> Record Document 127-11 at 9–10. In contrast, as provided above, Fox does not have the opinion of a qualified expert to rebut this view. <u>See</u> <u>supra</u>

Section II.A. For these reasons, the Court finds that both fee agreement modifications were more than fair and reasonable to Fox in this case.

### 3. Whether the Firms' Forty Percent Contingency Fee Is "Clearly Excessive"

Lastly, the Firms move for summary judgment as to whether the forty percent contingency fee is "clearly excessive," or unreasonable, under Rule 1.5(a). Record Document 127-1 at 45. Like any other fee arrangement, contingency fees are subject to the reasonableness standard under Rule 1.5(a), even if the other requirements listed in Rule 1.5(c) are satisfied. See ABA Formal Op. 11-458 at 1 (2011) (citing Model Rules of Prof'l Conduct 1.5 cmt. 3). Further, the reasonableness of a fee agreement is generally assessed as of the time the contract is entered into. See Restatement § 34 cmt. c. In addition, Rule 1.5(a) sets forth a series of factors to be considered in determining whether a fee is reasonable, including:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)     whether the fee is fixed or contingent.

La. Rules of Prof'l Conduct 1.5(a). These factors are not exclusive, nor will each factor be relevant in each instance. <u>See</u> Model Rules of Prof'l Conduct 1.5 cmt. 1.

In the case at hand, the Court finds that there is no genuine dispute of material fact as to whether the Firms' contingency fee is reasonable due to the foregoing factors being clearly met in this case. At the outset, the Court notes, as it did in its prior ruling in this case, that it appears from the record that the Firms "did a masterful job in their representation of Fox" and in procuring the result obtained, an outcome made even more telling considering the bleak outlook of Fox's position throughout the duration of the bankruptcy proceedings. Record Document 81 at 26; <u>see</u> discussion <u>infra</u>. Furthermore, the fact that Fox received what may have been a much higher recovery than what was initially anticipated under the circumstances is not grounds for this Court to modify the agreement in hindsight when it has already concluded above that it was reasonable at the time it was entered into. <u>See</u> <u>supra</u> Section II.C.2; <u>Farrar v. Kelly</u>, 440 So. 2d 939, 942 (La. App. 2d Cir. 1983); <u>see also</u> <u>In re Lawrence</u>, 24 N.Y.3d 320, 339 (N.Y. 2013) (noting that "it is not unconscionable for an attorney to recover much more than he or she could possibly have earned at an hourly rate," and, further, "[that] the contingency system cannot work if lawyers do not sometimes get very lucrative fees").

Here, the record evidence clearly demonstrates that the Firms' seven-year representation of Fox not only demanded substantial time and effort,[5] but also a high

---

[5] According to their testimony in the record, the Firms collectively spent 3,990 hours in their representation of Fox. <u>See</u> Record Document 127-9 at 3; Record Document 127-10 at 2.

degree of skill as the litigation involved numerous snags and complex problems, many of which required equally complex and innovative solutions to remedy. See Record Document 127-11 at 9–10. As previously noted, the Firms confronted difficult circumstances from the beginning of their representation of Fox due to the financially dire state of the bankruptcy estate when the initial contingency fee agreement was signed. Specifically, as explained by the Trustee, not only was Fox significantly hindered in improving the condition of the bankruptcy estate due to Rosbottom's conduct, but was also at risk of recovering nothing in the event of foreclosure due to the substantial amount of debt owed by the estate. See Record Document 127-5 at 8, 18. Furthermore, although the financial condition of the estate had improved after confirmation of the Plan at the time the parties agreed to the second contingency fee agreement, there still remained significant risk that the Plan would fail due to, among other factors, the difficulty in obtaining the loans required to clear the estate's remaining debt. See id. at 181–82. Thus, not only was there substantial time and analysis involved throughout the entirety of the Firms' representation of Fox, but also significant risk that the Firms would not receive payment if the Plan ultimately proved unsuccessful.

The Court also notes, as provided above, that Fox lacks the opinion of a qualified expert to support her defense that the forty percent fee agreement is unreasonable or excessive. See supra p. 20 and Section II.A. Further, the one expert opinion applicable to this issue is that of the Firms' expert, Vance, who stated, inter alia, that the parties' contingency fee agreement was reasonable when viewed at the time it was made, and that the agreement satisfied the relevant factors under Rule 1.5(a). See Record Document 127-11 at 9–10. Specifically, Vance opined in his report that the forty percent

contingency fee is reasonable and "within the range of contingency fee percentages for legal representation in Louisiana." Id. at 25. Because the Court has precluded the opinions of Fox's experts as to whether the Firms breached their standard of care owed to Fox in agreeing to the forty percent contingency fee, the opinion of the Firms' expert regarding this issue is effectively unrebutted.

Lastly, Fox argues that the reasonableness of the contingency fee is a fact issue that cannot be resolved at the summary judgment stage. See Record Document 139-3 at 19. However, this contention, as with her previous arguments, is equally without merit. First, under the applicable jurisprudence, Fox's lack of a qualified expert to support her claim that the Louisiana contingency fee is unreasonable is, alone, grounds for dismissal of her case on summary judgment. See, e.g., Reed v. Verwoerdt, 490 So. 2d 421, 427 (La. App. 5th Cir. 1986) (finding that a case involving the reasonableness of a contingency fee "of necessity needed expert testimony to establish the alleged negligence of the attorneys"). Furthermore, based on the ample record evidence and reasons provided above, the Court finds that no reasonable trier of fact could conclude that the contingency fee was unreasonable under the circumstances in this case. See Jacobsen v. Oliver, 555 F. Supp. 2d 72, 87 (D.D.C. 2008). Accordingly, Fox's claims on the contingency fee contract cannot survive summary judgment and must be dismissed.

III. **CONCLUSION**

The Court finds that the parties' Louisiana contingency fee agreement is reasonable and thus enforceable in this case. Fox is hereby ordered to specifically perform as required under the contingency fee agreement and pay all fees, costs, and expenses due to the Firms. Additionally, in order to preserve the Firms' contingency fee

percentage of Fox's recovery from the bankruptcy proceedings, the Court hereby enters a money judgment in favor of the Firms and against Fox for forty percent (40%) of the gross proceeds (whether in cash or property) of Fox's recovery from the bankruptcy proceedings, as provided for in the contingency fee agreement, plus any costs and expenses pursuant to that fee agreement. <u>See</u> <u>supra</u> p. 8.[6]

Accordingly, based on the foregoing reasons, the Firms' Motion for Summary Judgment (Record Document 127) is **GRANTED** and Fox's Motion for Partial Summary Judgment (Record Document 134) is **DENIED**. Therefore, all of Fox's claims are hereby **DISMISSED WITH PREJUDICE**. Additionally, the Firms' <u>Daubert</u> motions (Record Documents 142 and 143) are **GRANTED** and Fox's Motion to Strike (Record Document 152) is **DENIED**.

A judgment consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 14th day of May, 2019.

_____
S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[6] The Court determines that this remedy is appropriate based on its precedential support in the relevant case law. <u>See, e.g.</u>, <u>Roberts v. Hanover Ins. Co.</u>, 338 So. 2d 158, 159 (La. App. 2d Cir. 1976) (finding that in parties' contingency fee contract whereby client agreed to pay a fee of forty percent of any amount collected, attorney was entitled to "a privilege of first rank for [his] fees on [the] judgment[] obtained by [him] and on the property recovered thereby"); <u>see also</u> <u>Theodile v. RPM Pizza, Inc.</u>, 03-987 (La. App. 3d Cir. 2/4/04), 865 So. 2d 980, 984 (stating that the attorney's lien provided in La. R.S. 37:218 and 9:5001 extends to any expenses advanced on behalf of the client as permitted by the Louisiana Rules of Professional Conduct).